IN THE UNITED STATES DISTRICT COURT
FOR THE SOUHTERN DISTRICT
HOUSTON, DIVISION

LARRY RAY SWEARINGEN,
TDCJ No. 999361
        Plaintiff,

v.

**CIVIL CASE NO. _____**

BRYAN COLLIER,
Executive Director, Texas Department of
Criminal Justice;

**DEATH PENALTY CASE**

**PLAINTIFF LARRY RAY
SWEARINGEN IS SCHEDULED FOR
EXECUTION ON AUGUST 21, 2019**

LORIE DAVIS,
Director, Correctional Institutions Division,
Texas Department of Criminal Justice,

BILLY LEWIS,
Senior Warden, Huntsville Unit Huntsville,
Texas

and

UNKNOWN EXECUTIONERS;
        Defendants (individuals sued only in
their official capacity).

**COMPLAINT FILED PURSUANT TO 42 U.S.C. § 1983**

Dated: August 16, 2019

Philip H. Hilder
James G. Rytting
   *Counsel of Record*
**HILDER & ASSOCIATES, P.C.**
819 Lovett Boulevard
Houston, TX 77006
(713) 655-9111
james@hilderlaw.com

*Attorneys for the Plaintiff*
*Larry Ray Swearingen*

## COMPLAINT FILED PURSUANT TO 42 U.S.C. § 1983

1.      Plaintiff LARRY RAY SWEARINGEN is scheduled to be executed on August 21, 2019 by lethal injection of pentobarbital.  As detailed herein, the vials of pentobarbital to be used in Mr. Swearingen's execution were compounded under circumstances which indicate that the drug is of inferior quality and potency, and likely further deteriorated over time through ineffective maintenance practices.  Moreover, the vials—which will be 429 days old at the time of Mr. Swearingen's execution—far exceed the maximum 45 day Beyond Use Date ("BUD") for this substance.  In similar circumstances, improperly compounded and ineffectively maintained pentobarbital has resulted in executions lasting longer than twenty minutes. Moreover, as explained herein and in further detail in the supporting declaration of Doctor of Pharmacy, Michaela Almgren, deficient pentobarbital creates a substantial risk that the injection will not end Swearingen's life.  Exhibit 'A' (Declaration of M.M. Almgren, Phd, with CV).

2.      Mr. Swearingen does not challenge his execution here.  Instead, he merely requests that the drugs utilized in his execution be properly tested soon before his execution, at least within the time period set out by industry best practice.  This request is not unprecedented. In *Whitaker v. Livingston*, the Honorable District Court Judge Lynn N. Hughes ordered:

> Texas will test the drugs before using them on the plaintiffs. Williams and Whitaker will be killed by reliable compounded pentobarbital.

No. CV H-13-2901, 2016 WL 3199532, at *8 (S.D. Tex. June 6, 2016), *aff'd sub nom. Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017).  In Whitaker, the Defendants stipulated that it would conduct additional testing of the compounded pentobarbital prior to an execution.  *See Whitaker v. Collier*, 862 F.3d at 494.  Defendants then confirmed their commitment to retest the compounded pentobarbital prior to an execution during argument at the Fifth Circuit Court of

Appeals. Id. at 494 n.4. Despite these representations to the Federal District Court and Court of Appeals in Whitaker, Defendants do not actually intend to retest the compounded pentobarbital to be used in Mr. Swearingen's executions. This simple safeguard, however, will ensure a humane and effective execution consistent with the Eighth Amendment to the United States Constitution and Texas law.

3. Mr. Swearingen brings this action pursuant to 42 U.S.C. §1983, alleging violations and threatened violations of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution to be free from cruel and usual punishment to due process of law. Plaintiff seeks declaratory and injunctive relief against the Defendants Bryan Collier, Lorie Davis, Billy Lewis, and Unknown Executioners (collectively, "Defendants").[1] Mr. Swearingen asks this Court for a declaration that the manner in which Defendants plan to execute Mr. Swearingen is unconstitutional, unless the compounded pentobarbital utilized has been properly tested within the industry standard time periods. Based on the finding of a constitutional violation, Mr. Swearingen also seeks injunctive relief requiring that the specific vials of drugs to be used in Mr. Swearingen's execution be tested prior to the scheduled execution date of August 21, 2019.

## I.  PLAINTIFF

4. Plaintiff Larry Ray Swearingen is a person within the jurisdiction of the State of Texas. He is currently a death-sentenced inmate under the supervision of the Texas Department of Criminal Justice, TDCJ #999361. He is confined at the Polunsky Unit in Livingston, Texas.

---

[1] Individual defendants are sued only in their official capacity. The suit is brought against the individual defendants in an abundance of caution because sovereign immunity and other jurisdictional issues may be an impediment to bringing a cause of action against the state and county agencies which they serve.

## II.    DEFENDANTS

5.    Defendant Bryan Collier is the Executive Director of the Texas Department of Criminal Justice.

6.    Defendant Lorie Davis is the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice ("TDCJ"), and holds the power, by statute, to determine and supervise the manner by which death sentenced inmates are executed.  Tex. Code Crim. Proc. art. 43.14.

7.    Defendant Billy Lewis is the Senior Warden of the Huntsville Unit, where executions take place.

8.    Defendants Unknown Executioners are employed by the Texas Department of Criminal Justice and carry out executions in Texas.  Plaintiff does not yet know their identities because the TDCJ conceals them.

9.    The Defendants are all State officials acting, in all respects relevant to this action, under color of State law.  They are all sued in their official capacities.

## III.    JURISDICTION & VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201 (declaratory relief), and 2202 (further relief).  This action arises under the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

11.    Venue in this Court is proper under 28 U.S.C. § 1391, and this Court has personal jurisdiction over the defendants in this matter because the events giving rise to this claim – both executions and the procurement and maintenance of drugs used in the lethal injection process – occur in Huntsville, Texas.

## IV.    EXHAUSTION OF REMEDIES

12.    Plaintiff need not exhaust administrative remedies under 42 U.S.C. § 1997(a) because he is not challenging his conditions of confinement, and because no administrative remedies exist that could address his claims.

## V.    FACTUAL BACKGROUND

13.    Under Texas law, Defendants have the statutory authority and duty to establish and administer a lethal injection protocol.  The Texas Code of Criminal Procedure provides:

> Whenever the sentence of death is pronounced against a convict, the sentence shall be executed at any time after the hour of 6 p.m. on the day set for the execution, by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead, such execution procedure to be determined and supervised by the Director of the Institutional Division of the Texas Department of Criminal Justice.

Tex. Code Crim. Proc. art. 43.14 (Vernon Supp. 2004–2005). "No torture, or ill treatment, or unnecessary pain, shall be inflicted upon a prisoner to be executed under the sentence of the law." *Id*. art. 43.24.

14.    This statute requires the director of the Division to determine and supervise Texas's lethal-injection protocol.  *Id.*

15.    The statute does not require specific drugs, dosages, or drug combinations, and does not require a specific manner of intravenous access for the execution.  *Id.*

16.    The current execution protocol was written and adopted in April 2019, and designates that the drug pentobarbital shall be used to carry out executions.

17.    Pentobarbital is a barbiturate, and is classified by the Drug Enforcement Administration (DEA) as a Schedule II controlled substance.  It has few authorized uses in humans – primarily (and rarely) used for anesthesia, and for the euthanasia of animals.

18.     For each execution, the State of Texas either uses 2 vials of 50 mg/mL (2.5 g) of pentobarbital, or 1 vial of 100mg/ml (5 g).

19.     TDCJ's Director has the unilateral power to change the protocol at any moment.  Tex. Code Crim. Proc. art. 43.14.

A.      **PENTOBARBITAL MADE BY COMPOUNDING**

20.     In September 2013 Texas began purchasing and using compounded – rather than manufactured - pentobarbital to carry out executions.  Upon information and belief, Texas continues only to use compounded pentobarbital to this day.

21.     Pharmacy compounding is a practice by which a pharmacist combines, mixes, or alters ingredients in response to a prescription to create a medication tailored to the medical needs of an individual patient. Independent laboratories can test compounded drugs for a variety of measures, including identity, strength, and contaminants.

22.     The United States Pharmacopeia ("USP") classifies compounded pentobarbital as a high-risk sterile injectable. *See* USP General Chapter <797>, Pharmaceutical Compounding – Sterile Preparations.[2]

23.     Pentobarbital is especially risky in its compounded form, both because of the unregulated nature of the compounding industry, and because there is no scientific description of, or formula for, the process of compounding pentobarbital for use in executions.

24.     Commercial (manufactured) pharmaceutical products require compliance with a rigorous licensing process and are the result of substantial scientific research and development programs.

---

[2] The USP is the seminal scientific advisory publication concerning the compounding of sterile injectables.

25.     Pharmaceutical compounded preparations have numerous exemptions from the licensing process and accordingly, do not require established scientific investigations ("proof") for specific formulations.

26.     Compounding pharmacies often lack the infrastructure needed to make sterile, potent, and safe injectable pentobarbital.

27.     FDA inspections routinely uncover compounding pharmacies that have not followed procedures designed to prevent drug contamination.

28.     When pharmacies compound high-risk sterile products on small scale, there is no mandated testing or quality control to determine that the syringe contains the accurate amount or potency. Instead, it is at the pharmacist's discretion whether to test potency on an individual vial-by-vial basis or forego this step. The lack of mandated testing for compounding pharmacies differs from the standards required for pharmaceutical manufacturers and 503b outsourcing facilities, where quality assurance testing must take place.

29.     The integrity, potency, and sterility of compounded pentobarbital are affected by, among other things: the quality of the active pharmaceutical ingredient ("API") used to make the drug; the quality of the compounder and the conditions of the laboratory in which the drug is compounded; the time between compounding and use; the conditions and manner of storage between compounding and use; the assigned beyond use date ("BUD") and the qualifications of and method used by the person assigning the same.

30.     There is a substantial risk that drugs that are not the appropriate potency or composition, or are contaminated, degraded, or contain impurities, will become ineffective and fail to cause death as required under Texas law.

   **B.     POTENCY AND STERILITY**

31.     Potency is the amount of drug required to produce a specific effect.

32.     According to pharmaceutical expert Dr. Michaela Almgren, if the pentobarbital used in Mr. Swearingen's execution is sub-potent, Mr. Swearingen will not receive the intended dosage required to cause death.  Almgren Decl. ¶ 18.

33.     Upon information and belief, although the State of Texas tests one vial per batch of compounded pentobarbital for potency, sterility, and the presence of contaminates when the State receives the drug from its supplier, the State does not test each individual vial intended for use in lethal injection for potency, sterility, or contamination, and does not re-test the drug shortly before it is used for lethal injection.

34.     According to expert Dr. Almgren, it is not possible to accurately determine potency for an entire batch of compounded sterile products without conducting individual testing of each vial in that batch. Almgren Decl. ¶ 16.

35.     Sterility can be defined as the freedom from the presence of viable microorganisms. When microorganisms and contaminants are present in a pharmaceutical product, this can cause significant changes to the composition of the drug and impact potency.

36.     22 Tex. Admin. Code § 291.133 also requires that the ingredients used in sterile compounding be of USP/NF grade, or chemical grade if USP/NF grade substances are not available. It further states that the ingredients must be purchased from a FDA-registered facility, or if not purchased from a FDA-registered facility, the pharmacist must establish purity and stability by obtaining a Certificate of Analysis from the supplier and compare the monograph of drugs in a similar class to the Certificate of Analysis.

37.     The State of Texas has not provided any such Certificate of Analysis and has been unable to confirm whether the drug ingredients were obtained from a FDA-registered facility.

## C.    **BEYOND USE DATES**

**38.** Compounded preparations have a much shorter "shelf life" than manufactured drugs, and are assigned a 'beyond use date,"(BUD) intended to prevent degradation of a compound. 22 Tex. Admin. Code § 291.133 requires that a product's BUD shall be determined as outlined in Chapter 797, Pharmacy Compounding--Sterile Preparations of the USP/NF. The BUD is defined in USP <797> as "the date or time after which a CSP shall not be stored or transported. The BUD is determined from the date and time the preparation is compounded." A drug that has surpassed its beyond use date is at risk of stability and sterility failings, and may not retain sufficient potency. Almgren Decl. ¶ 8.

39. USP <797> sets the BUD for high-risk compounded sterile preparations such as compounded pentobarbital as follows:

- ▪ 24 hours, if stored at room temperature,
- ▪ 72 hours, if kept refrigerated, or
- ▪ 45 days, if kept in a solid, frozen state

40. Pentobarbital is more stable when stored in a solid, frozen temperature (with a maximum beyond use date of 45 days), and less stable when stored at a cold (i.e.,refrigerated) temperature (3 days) and controlled room temperature (24 hours).

41. Upon information and belief, Defendants keep the lethal injection drugs at room temperature or refrigerated, but not frozen.

42. Compounded pentobarbital that has surpassed its recommended BUD has a high risk of improper potency, composition, contaminants, impurities, and degradation. These risks grow as the length of time beyond the BUD increases.

## D. INFERIOR QUALITY OF COMPOUNDED PENTOBARBITAL TO BE USED IN MR. SWEARINGEN'S EXECUTION

43.    Plaintiff Swearingen sent Defendants a Public Information Act request on July 18, 2019, requesting information about the drugs that will be used to carry out his execution.  In response, he received the documents, which state that the State of Texas intends to execute Mr. Swearingen by a single injection of compounded pentobarbital.

44.    Testing was conducted on two occasions,  June 22, 2018 and May 3, 2019, on a single vial of compounded pentobarbital in the State's possession, and used to extrapolate the potency of the other untested vials within that batch. Exhibit 'B'.

45.    When the unknown laboratory tested this single vial of the batch of compounded pentobarbital, the potency was 98.0%. The vial passed microbiology tests that were conducted (Scan RDI and Bacterial Endotoxins).

46.    Nearly one year later, on May 3, 2019, an unknown laboratory tested one vial of the same batch of compounded pentobarbital for potency. The potency was 98.8%. Microbiology tests determining the presence of bacterial endotoxins were not performed at this time.

47.    It is not clear whether the vial that was tested during these two tests will be the same vial used in Mr. Swearingen's execution, or whether the State of Texas intends to use a completely different vial or vials from the same batch in Mr. Swearingen's execution.

48.    Without testing of each of the individual vials intended for Mr. Swearingen's execution, there is no way of knowing whether these vials are of adequate potency to cause death.

49.     Dr. Almgren avers that testing one vial in a batch does not provide information about the potency, sterility, or contamination of other vials within that batch. Almgren Decl. ¶ 26.

50.     Since testing for contaminates did not even take place during the May 3, 2019 testing, the presence of contaminates in all of the vials from this batch of pentobarbital is unknown.

51.     Without access to the compounding records kept by the pharmacy to document how the drug was prepared, and without knowing whether individual testing took place at the time of compounding, experts cannot confirm that the drugs intended for use in Mr. Swearingen's execution were correctly made, contain the appropriate amount of active ingredient, or will be sufficient to cause death.

52.     According to Dr. Almgren, the drugs intended for use in Mr. Swearingen's execution are far beyond the USP recommended beyond use date ("BUD"). Almgren Decl. ¶ 7.

53.     One of the vials of pentobarbital in the batch acquired by the State of Texas on June 18, 2018 was originally tested on or about June 22, 2018, and assigned a BUD of June 5th, 2019. However, this vial was later tested again and assigned a new BUD of May 6th, 2020. This means that the drugs intended for Larry Swearingen's execution will be 430 days old when they are used in his execution on August 21, 2019.

54.     The drugs intended for use in Mr. Swearingen's execution have been given a beyond use date that far exceeds what is considered appropriate under USP <797>, regardless of the temperature at which the drugs were stored. According to Dr. Almgren, the amount of time that has elapsed between compounding and use can impact potency, rendering the drugs insufficient to cause death.

55.     Without testing the individual vials intended for Mr. Swearingen's execution, there is also a serious risk that these vials could have become degraded or contaminated.

56.     According to Dr. Almgren, poor storage conditions frequently cause degradation and contamination of drug products. Pentobarbital and other compounded sterile products need to be kept in proper storage conditions or they can become damaged and unusable. The same is true for pentobarbital's active pharmaceutical ingredient. Almgren Decl. ¶ 14.

57.     Storage conditions for these vials and their active ingredients are entirely unknown. It is also unknown how the drugs and active ingredients were transferred to the State of Texas, and whether such transfer took place with appropriate handling and under the appropriate temperature-controlled conditions.

58.     It is also not clear how the drugs have been handled by Texas state officials, compounding personnel, or testing laboratory employees, and whether such people took the effective precautions to minimize the risk of touch contamination, the most common reason for contamination.

59.     Subsequent testing for potency, stability, and sterility for these vials would be needed to ensure that the drug has not yet become too degraded or contaminated to reliably cause death.

60.     Upon information and belief, the bulk active pharmaceutical ingredient (API) used to make these products was obtained by the State of Texas in November of 2014. The State of Texas then reportedly transferred small quantities of the ingredient to an anonymous pharmacy or pharmacies for compounding into an injectable solution. *See Chris McDaniel, Inmates Said The Drug Burned As They Died. This Is How Texas Gets Its Execution Drugs., Buzzfeed News,*

*November 28, 2018, https://www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas (last visited Aug 16, 2019).*

61.     The origin of the API used to prepare the vials intended for Mr. Swearingen's execution is not clear.  If the vials were prepared using the same batch of API obtained by the State of Texas in 2014 and used in previous executions, this API would be at least five years old, far surpassing the appropriate age for ingredients used in standard clinical practice.  Appropriate clinical practice dictates that active pharmaceutical ingredient itself is tested before compounding takes place.

62.     The State of Texas has not provided any information to indicate that the anonymous compounding pharmacy or pharmacies have tested this API to determine whether it is still potent.

63.     According to Dr. Almgren, there is a high risk that the ingredients may no longer be potent given the significant time that has passed. Almgren Decl. ¶ 43.

64.     Without further testing, there is a substantial risk that the vials intended for Mr. Swearingen's execution are of insufficient potency and stability to cause death.

65.     Poor pharmacy practices and a lack of transparency create the substantial risk that the drugs that the State of Texas intends to use in Mr. Swearingen's execution are not of the appropriate potency to cause death.

66.     The substantial risk that Defendants' compounded pentobarbital will fail to cause Mr. Swearingen's death as required by Texas law can only be ameliorated by testing the individual vials intended in Mr. Swearingen's execution for stability, sterility, and contaminants will determine whether the drugs have the appropriate potency to cause death .

### E.     PAST VIOLATIONS OF A KNOWN COMPOUNDING PHARMACY FOR PENTOBARITROL

67.     Compounded pentobarbital prepared for the State of Texas is made by one or more anonymous compounding pharmacies.

68.     Upon information and belief, the State of Texas uses the Houston-based pharmacy, Greenpark Compounding Pharmacy ("Greenpark")  to prepare the lethal injection drugs for use in its executions.

69.     Greenpark has been cited for multiple safety violations and has a notable record of infractions.

70.     In November 2016, Greenpark's license was put on probation after the Texas State Board of Pharmacy found that it had forced quality control documents and had compounded the wrong drug for three different children, which resulted in once child having to go to the emergency room after experiencing adverse effects.

71.     In 2017, Food  and Drug Administration ("FDA") cited Greenpark for several potential sterility violations.

72.     As of November 2018, Greenpark had received 48 violations in the past eight years, including keeping out-of-date drugs in stock, using improper procedures to prepare IV solutions, and inadequate cleaning of hands and gloves.

**F.     RECENT EXECUTIONS USING INFERIOR COMPOUNDED PENTOBARBITAL  SHOW SIGNS OF FAILURE**

73.     Several recent executions performed by the Defendants using their compounded pentobarbital showed signs that these drugs are beginning to fail.

74.     On January 30, 2018, prisoner William Rayford was executed by the State of Texas.  During Mr. Rayford's execution, after pentobarbital had been administered, he attempted to sit up, lifted his head, jerked his head back multiple times, grimaced, and shook.

75.     On January 18, 2018, Texas executed Anthony Shore. At the end of Mr. Shore's final statement, he began to tremble, appeared agitated, and said "I can feel that it does burn. Burning!"

76.     On February 1, 2018, the State of Texas executed John David Battaglia using pentobarbital. It took 22 minutes from the time of administering the drug until the time of death and before then, Mr. Battaglia gasped twice and exclaimed "Oh, I feel it."

77.     On May 16, 2018, the State of Texas executed Juan Castillo using pentobarbital. It took 23 minutes between drug administration and the time of death and in between, Mr. Castillo exclaimed "[EXPLETIVE] does burn."

78.     On June 27, 2018, the State of Texas executed Danny Bible using pentobarbital. After the pentobarbital was administered, Mr. Bible cried out "burning" and "it hurts".

79.     On July 17, 2018, the State of Texas executed Christopher Young using pentobarbital. It took 25 minutes from the time of administering the drug until the time of death, and Mr. Young cried out twice using an obscenity to say he could taste the drug and that it was burning. He also said something unintelligible before he stopped moving.

80.     On September 26, 2018, the State of Texas executed Troy Clark using pentobarbital. It took 21 minutes from the time of administering the drug until the time of death, and Mr. Clark stated that the drug "burned going in" and that "I feel it". He also grunted and gasped before he stopped moving.

81.     According to the information supplied by Defendants, the pentobarbital administered to each of Mssr. Rayford, Shore and Battaglia had been assigned a 'Beyond Use Date'(BUD) well beyond anything that was considered acceptable by the relevant scientific treatises or by experts in the field.

82.     Specifically, like the pentobarbital which is intended to be used on Mr. Swearingen, the compounded pentobarbital administered in these prior executions were beyond their use dates, and therefore unstable and at risk of sub-potency, a lack of integrity, and contamination.

83.     Because the State of Texas intends to use the same compounded drug administered to Mr. Rayford, Mr. Shore, and Mr. Battaglia to carry out Mr. Swearingen's execution, Mr. Swearingen is compelled to file this action to protect his constitutional rights.

84.     Evidence of compounding pharmacy mistakes and infractions, as well as past evidence that untested, compounded pentobarbital did not work as intended—such as causing a burning sensation and taking longer than anticipated—further suggests that the drugs intended for use in Mr. Swearingen's execution were either incorrectly made or are beginning to fail. There is a substantial risk that the Defendants' compounded pentobarbital will fail to cause Mr. Swearingen's death as required by Texas law.

## VI.     PROCEDURAL BACKGROUND

85.     In 2000, Mr. Swearingen was convicted and sentenced to death by a jury in the 9th District Court for the rape and murder of Melissa Trotter. Since his conviction, Mr. Swearingen has maintained his innocence and has sought relief from the courts.

86.     Mr. Swearingen's conviction was affirmed on appeal, *Swearingen v. State*, 101 S.W.3d 89 (Tex. Crim. App. 2003), and the following habeas petitions have been denied or dismissed. *Ex parte Swearingen*, No. WR-53,613-01 (Tex. Crim. App. May 21, 2003); *Ex parte Swearingen*, No. WR-53613-04, 2008 WL 152720 (Tex. Crim. App. Jan. 16, 2008); *Ex parte Swearingen*, No. WR-53613-05, 2008 WL 650306 (Tex. Crim. App. Mar. 5, 2008); *Ex parte*

*Swearingen*, No. WR-53613-05 (Tex. Crim. App. Dec. 17, 2008) (not designated for publication); *Ex parte Swearingen*, No. WR-53613-08 (Tex. Crim. App. Jan. 27, 2009) (not designated for publication); *Ex parte Swearingen*, No. WR-53613-09 (Tex. Crim. App. Jan. 27, 2009) (not designated for publication); *Ex parte Swearingen*, Nos. WR-513613-10, WR-53613-11, 2011 WL 3273901 (Tex. Crim. App. July 28, 2011); *Swearingen v. Thaler*, No. H-09-300, 2009 WL 4433221 (S.D. Tex. Nov. 18, 2009); *Swearingen v. Thaler*, 421 Fed. App'x 413 (5th Cir. 2011); *Ex parte Swearingen*, Nos. WR-53613-10, WR-53613-11, 2012 WL 6200431 (Tex. Crim. App. Dec. 12, 2012); *State v. Swearingen*, 478 S.W.3d 716 (Tex. Crim. App. 2015).  On August 8,

## VII.    LEGAL CLAIMS

87.    Mr. Swearingen re-alleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint.

88.    42 U.S.C. §1983 provides a federal cause of action for  "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a "person" acting "under color" of state law.

### COUNT 1

**There is a Substantial Risk that Defendants' Compounded Pentobarbital Will Fail to Cause Death, Thus Resulting in Torture, Ill Treatment, or Unnecessary Pain In Violation of Mr. Swearingen's Right to be Free From Cruel and Unusual Punishment**

89.    The Eighth Amendment guarantees every person the right to be free from cruel and unusual punishment. Cruel and unusual punishment is inflicted where a method of execution creates a "substantial risk of serious harm." *Baze v. Rees*, 553 U.S. 36, 55 (2008). Upon

information and belief, although it is possible to conduct executions in a constitutionally compliant manner, Defendants have deliberately chosen not to do so.

90. The intended method of execution presents a substantial risk that the vials intended for Mr. Swearingen's execution are of insufficient potency and stability to cause death. That risk is "'substantial when compared to the known and available alternatives.'" *Glossip v. Gross*, 135 S.Ct. 2726, 2737 (2015) (citing *Baze*, 553 U.S. at 61); *see also Louisiana ex. rel. Francis v. Resweber*, 329 U.S. 459 (1984); *Gregg v. Georgia*, 428 U.S. 153 (1976); *LaChance v. Erickson*, 522 U.S. 262 (1998); *Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950). *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); *see also Bucklew v. Precythe*, 139 S. Ct. 1112, 203 L. Ed. 2d 521 (2019)[3]

Administering drugs intended to cause an execution and yet failing to actually execute that individual would result in a mock execution, a recognized form of torture. *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010) (mock executions included as evidence of torture); *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 339 (D.D.C. 2016) (same).

91. Carrying out Mr. Swearingen's execution with the current drug supply, without proper testing, presents an "'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 135 S.Ct at 2737 (citing *Baze*, 553 U.S. at 50). "[S]ubjecting individuals to a risk of future harm—

---

[3] The relief requested in this lawsuit is simply to conduct a proper test of the drugs used to execute Mr. Swearingen. If the law allows naming an alternative to using the Defendants' stale vials of compounded pentobarbital without proper testing, Mr. Swearingen suggests that Texas use a firing squad as a constitutional alternative. Firearms are intended to be used, and are proven to be effective, in causing death.

not simply actually inflicting pain—can qualify as cruel and unusual punishment." *Baze*, 553 U.S. at 49.

92.     Dr. Almgren avers that compounded drugs that are consumed beyond the use by date set out by USP <797> raise a substantial risk that there will be problems with sterility and potency that could cause the drug not to work for purposes of execution. Almgren  Decl. ¶ 41.

93.     The drugs Defendants have stated will be used to carry out the scheduled execution of Mr. Swearingen are well beyond any scientifically acceptable BUD. *See* ¶ 53, supra.

94.     There is a substantial risk that injection of drugs that are impotent, contaminated, or impure will not work as intended and will fail to cause death as required under Texas law. The relief requested in this lawsuit is simply to conduct a proper test of the drugs used to execute Mr. Swearingen.   If the law allows naming an alternative to using the Defendants' stale vials of compounded pentobarbital without proper testing that is not provided for under Texas law, Mr. Swearingen suggests that Texas use a firing squad.  Firearms when operated by trained individuals are intended to be used, and are proven to be effective, in causing death.

95.     The firing squad has been a recognized form of punishment in the United States since before the Founding.  *See* Deborah W. Denno, *The Firing Squad as a "Known and Available Method of Execution" Post-Glossip*, 49 U. Mich. J. L. Reform 749, 778 (2016). Oklahoma and Utah currently allow for the firing squad as a method of execution. Okla. Stat. tit. 22 § 1014 (2015); Utah Code Ann. § 77-18-5.5(1)–(4).  The firing squad is also known around the world – it is the second most common method of execution internationally, and provided for in law by 53,76% of countries whose laws provide for capital punishment. *See* Amicus of Scholars and Academics of Constitutional Law, *Bucklew*, 139 S. Ct. Furthermore, the firing squad is feasible and readily implemented in the State of Texas. The State's law-enforcement

18

population have firearms at their disposal, and the types of firearms needed are neither hard to find nor difficult to use. Utah firing squads, for example, rely on .30 caliber Winchester rifles. (Brady McCombs, *Firing Squad Gets Final OK. So How Does It Work?*, The Associated Press, Mar. 24, 2015, *available at* goo.gl/fKE5wx). This alternative is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737, *see also Bucklew*, 139 S. Ct., Kavanaugh J., concurring opinion ("[A]n inmate who contends that a particular method of execution is very likely to cause him severe pain should ordinarily be able to plead some alternative method of execution that would significantly reduce the risk of severe pain. At oral argument in this Court, the State suggested that the firing squad would be such an available alternative, if adequately pleaded. Tr. of Oral Arg. 63–64 ("He can plead firing squad.... Of course, if he had ... pleaded firing squad, it's possible that Missouri could have executed him by firing squad").") Defendants are acting under color of Texas law in undertaking to execute Mr. Swearingen with drugs that (i) were either incorrectly made, (ii) fail to contain the appropriate amount of active ingredient, or (iii) will be insufficient to cause death., such that there is a substantial risk that Mr. Swearingen will suffer serious harm in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

96. Accordingly, Mr. Swearingen is entitled to declaratory and injunctive relief as set forth below.

**COUNT 2**

**Denying Mr. Swearingen Access to Information About The Vial of Drug Intended To be Used for His Execution Violates His Right to Due Process, Notice, an Opportunity to be Heard, and Access to Courts Under the Fourteenth Amendment**

97.     Under the Due Process Clause of the Fourteenth Amendment, governmental decisions that deprive individuals of "liberty" or "property" interests are constrained by and must adhere to procedural due process.  Due process requires the opportunity to receive notice of how one's rights will be affected and the opportunity to respond and be heard. See Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976).

98.     Defendants are acting under color of Texas law in denying Mr. Swearingen access to information about the vial of drug intended to be used for his execution, including information about the potency, sterility, and efficacy of the pentobarbital to be used.  This deprives Mr. Swearingen of his ability to protect his right to not be subject to cruel and unusual punishment under the Eighth Amendment.

99.     Impeding Mr. Swearingen's ability to litigate whether this execution will fail to comport with constitutional requirements violates his right to due process, notice, an opportunity to be heard, and access to courts in violation of Fourteenth Amendment to the United States Constitution.

100.     In *Bounds v. Smith*, the United States Supreme Court recognized that the right to access the courts, rooted in the Fourteenth Amendment, requires that the states make available

the tools necessary for prisoners to obtain meaningful access to available judicial remedies. 430 U.S. 817, 828 (1977); *Lewis v. Casey*, 518 U.S. 343, 346 (1996).

101. The Fifth Circuit has recognized that prisoners have a right to access the courts under the Fourteenth Amendment. In *Toppins*, the Fifth Circuit found that in order for a prisoner to prevail on a denial of access to courts claim, he must show that he incurred an actual injury. *See id.* at *4 (citing *Lewis*, 518 U.S. at 350–52).

## COUNT 3

**There is a Substantial Risk that Defendants' Compounded Pentobarbital Will Fail to Cause Death, Thus Resulting in Torture, Ill treatment, or Unnecessary Pain In Violation of Mr. Swearingen's Right to Due Process of Law**

102. Texas law requires that Defendants to conduct Mr. Swearingen's execution by "intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead. . ." Tex. Code Crim. Proc. art. 43.14 (Vernon Supp. 2004–2005). Texas law also prohibits the infliction of "torture, or ill treatment, or unnecessary pain" upon a prisoner to be executed under the sentence of the law. *Id.* art. 43.24.

103. Because there is a substantial risk that Defendants' compounded pentobarbital will fail to cause Mr. Swearingen's death, and in so failing inflict torture and unnecessary ill treatment and pain, Defendants have created a substantial risk of arbitrarily depriving Mr. Swearingen of the benefit of Texas law in violation of his right to due process.

104. Accordingly, Mr. Swearingen is entitled to declaratory and injunctive relief as set forth below.

**Request for Injunctive Relief Releasing Vial of Pentobarbital to Be Used For Execution for Testing Prior to Execution**

105.    For the reasons stated above, the United States Constitution prohibits Defendants from proceeding with an execution that is likely to result in a mock execution and requires that Mr. Swearingen be afforded due process and access to the court to prevent the same. To effectuate this right, injunctive relief must be ordered compelling those Defendants who are custodians of pentobarbital identified in this Complaint as intended to be used for Mr. Swearingen's execution to be released to a third party pharmaceutical testing facility to ascertain the drug's potency and sterility and to assess the likelihood that the drug will or will not work to execute a person receiving the intended dosage. Accordingly, Mr. Swearingen asks this Court to grant prospective injunctive relief compelling the Defendants to release this vial of pentobarbital so that the requested testing can be accomplished.


**Request for Injunctive Relief Enjoining Execution Until Testing Has Occurred**

For the reasons stated above, the United States Constitution prohibits Defendants from proceeding with an execution that is likely to result in a mock execution and requires that Mr. Swearingen be afforded due process and access to the court to prevent the same. To effectuate this right, injunctive relief must be ordered enjoining those Defendants who are custodians of pentobarbital identified in this Complaint as intended to be used for Mr. Swearingen's execution from proceeding with the execution of Mr. Swearingen as currently intended and scheduled for August 21, 2019 unless and until an appropriate pharmaceutical testing facility has assessed the potency and sterility of the vial of pentobarbital to be used on Mr. Swearingen and has obtained results that the vial of drug will, in fact, work to execute Mr. Swearingen.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Mr. Swearingen prays that the Court provide relief as follows:

1. A declaratory judgment that Defendants' actions violate Mr. Swearingen's First, Eighth and Fourteenth Amendment rights;

2. Injunctive relief requiring Defendants to release the vial of pentobarbital intended to be used in Mr. Swearingen's scheduled execution for testing by an appropriate pharmaceutical testing facility to ascertain the drug's potency and sterility and to assess the likelihood that the drug will or will not work to execute a person receiving the intended dosage;

3. Injunctive relief enjoining Defendants from executing Mr. Swearingen with the execution drugs currently in their possession. as currently intended and scheduled for August 21, 2019, unless and until an appropriate pharmaceutical testing facility has assessed the potency and sterility of the vial of pentobarbital to be used and has obtained results that the vial of drug will, in fact, work to execute Mr. Swearingen; and

4. Reasonable attorneys' fees, costs of suit and such other and further relief as this Court deems just and proper.

Dated: August 16, 2019

Respectfully submitted,

s/ Philip H. Hilder
PHILIP H. HILDER
*Attorney-in-charge*
Texas State Bar No. 09620050
E-mail: philip@hilderlaw.com
JAMES G. RYTTING
Texas State Bar No. 24002883
E-mail: james@hilderlaw.com
**HILDER & ASSOCIATES, P.C.**
819 Lovett Boulevard
Houston, TX 77006
Telephone No.: 713-655-9111
Facsimile No.: 713-655-9112


*Attorneys for the Plaintiff*
*Larry Ray Swearingen*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16 day of August 2019, counsel of record for Defendants, listed below, who have consented to accept this Notice as service by electronic means, were served via the electronic filing system.

Sharon Howell
General Counsel
Texas Department of Criminal Justice
Sharon.howell@tdcj.state.tx.us

Jeffrey C. Matteer
First Assistant Attorney General
Office of the Texas Attorney General
Jeffrey.Mateer@oag.texas.gov

Ed Marshall
Assistant Attorney General
Office of the Attorney General
Marshall, Edward Edward.Marshall@oag.texas.gov

/s/ James G. Rytting_____